IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

RITA BROWN-FAGAN,         )
                              )
            Plaintiff,     )
                              )
       v.            )     Case No. 04-3394-CV-S-REL-SSA
                              )
JO ANNE BARNHART, Commissioner )
of Social Security,          )
                              )
          Defendant.    )

## <u>ORDER DENYING</u><br><u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Rita Brown-Fagan seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for a period of disability and disability insurance benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that the ALJ's residual functional capacity assessment is not supported by the evidence, and the ALJ failed to make explicit findings as to the physical and mental demands of plaintiff's past relevant work before finding that she could return to that work. I find that the ALJ properly discredited the opinions of Dr. Kaicher and Dr. Ward, his RFC determination is based on the substantial evidence in the record, and he properly found at step four of the sequential analysis that plaintiff could return to her past relevant work as an administrative clerk. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On April 16, 2002, plaintiff applied for a period of disability and disability insurance benefits alleging that she had been disabled since February 5, 2002. Plaintiff's disability stems from lumbosacral conditions, loss of hearing, anxiety attacks, and spastic colon. Plaintiff's application was denied. On January 27, 2004, a hearing was held before an Administrative Law Judge. On March 4, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 4, 2004, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into

Case 6:04-cv-03394-REL   Document 14   Filed 04/18/05   Page 2 of 39

consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national

3

economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th

Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations

setting out a sequential evaluation process to determine whether a claimant is

disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The

five-step sequential evaluation process used by the Commissioner is outlined in

20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?
                Yes = not disabled.
                No = go to next step.

2.      Does the claimant have a severe impairment or a combination of
impairments which significantly limits her ability to do basic work activities?

                No = not disabled.
                Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in
Appendix 1?

                Yes = disabled.
                No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant
work?

                No = not disabled.
                Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other
work?

                Yes = disabled.
                No = not disabled.

4

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert George Horne, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income, shown in actual earnings and in indexed earnings, from 1969 through 2001.

| Year | Earnings | Indexed Earnings |
|------|----------|------------------|
| 1969 | $    244.75 | $   1,335.29 |
| 1970 | 158.28 | 822.71 |
| 1971 | 746.68 | 3,695.41 |
| 1972 | 0.00 | 0.00 |
| 1973 | 3,729.00 | 15,818.31 |
| 1974 | 1,157.10 | 4,632.98 |
| 1975 | 4,117.68 | 15,340.57 |
| 1976 | 1,551.55 | 5,407.24 |
| 1977 | 0.00 | 0.00 |
| 1978 | 807.00 | 2,458.21 |
| 1979 | 1,679.14 | 4,703.40 |
| 1980 | 8,265.86 | 21,240.11 |
| 1981 | 0.00 | 0.00 |
| 1982 | 1,992.57 | 4,409.14 |

| | | |
|---|---|---|
| 1983 | 1,822.00 | 3,844.42 |
| 1984 | 5,644.94 | 11,249.53 |
| 1985 | 10,391.60 | 19,862.67 |
| 1986 | 14,327.17 | 26,595.79 |
| 1987 | 15,383.58 | 26,844.81 |
| 1988 | 16,624.00 | 27,647.70 |
| 1989 | 41,622.00 | 66,585.96 |
| 1990 | 38,524.00 | 58,908.76 |
| 1991 | 26,193.00 | 38,613.91 |
| 1992 | 14,576.42 | 20,435.73 |
| 1993 | 1,455.69 | 2,023.43 |
| 1994 | 1,857.48 | 2,154.44 |
| 1995 | 2,498.12 | 3,251.34 |
| 1996 | 13,334.91 | 16,546.40 |
| 1997 | 12,015.17 | 14,086.84 |
| 1998 | 5,931.00 | 6,607.79 |
| 1999 | 36,216.07 | 38,218.82 |
| 2000 | 19,164.42 | 19,164.42 |
| 2001 | 8,947.31 | 8,947.31 |

(Tr. at 39-40).

**Disability Report - Field Office**

On April 16, 2002, Linda Jarman of Disability Determinations had a face-to-face meeting with plaintiff (Tr. at 57-60). She reported that she observed plaintiff having no difficulty hearing, reading, breathing, understanding,

6

coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing (Tr. at 59).

**B.      SUMMARY OF MEDICAL RECORDS**

Below is a summary of the relevant, legible medical records.

On November 5, 1999, plaintiff saw John Kaicher, M.D., to establish care (Tr. at 155-157).  Her chief complaint was stress.  "She relates much of this to issues surrounding the settlement of her mother's estate; her mother died in May of this year. . . .  When questioned further, she admits that depression has been an issue for the last ten or twenty years.  Plaintiff smokes."  Dr. Kaicher diagnosed depression, irritable bowel syndrome, and smoking.  He gave her a trial of Effexor, refilled her other medications, cautioned her about excessive use of  Ativan, and counseled her regarding smoking.

On  December 13, 1999, plaintiff returned to see Dr. Kaicher for a follow-up on her depression (Tr. at 153-154).  "We again discussed her smoking.  She is currently using the nicotine patch and wants some kind of reassurance that the smoking withdrawal will ease up in the next few weeks."  Dr. Kaicher's impression included "Depression, responding well to Effexor" and "Tobacco abuse."  He encouraged plaintiff to continue the Effexor for at least 12 months.  Plaintiff was again counseled regarding the need to quit smoking.  "The bulk of this visit was for counseling which lasted 20 minutes."

On March 13, 2000, plaintiff saw Dr. Kaicher for her annual physical and pre-operative evaluation in anticipation of getting a face lift (Tr. at 148-152).  Her

7

past history included mild depression for which she had been on Effexor but discontinued this medication and stated she is doing relatively well now. History of tobacco abuse, had been on Wellbutrin but was not able to quit with this medication. Smoking one pack per day.

Dr. Kaicher performed a physical exam. Plaintiff's spine, ribs, and pelvis had normal alignment and mobility, no deformity. Both upper and both lower extremities had normal range of motion and strength, no joint enlargement or tenderness. Mental status exam: Judgment, insight intact. Orientation: oriented to time, place, and person. Memory intact for recent and remote events. Mood and affect: no depression, anxiety, or agitation.

His impression was tobacco abuse; history of mild depression, resolved. Plaintiff was counseled at length regarding the need to quit smoking with emphasis on the fact that discontinuing smoking at least two weeks before surgery will lessen her risk of anesthesia and surgical complications.

On October 2, 2001, plaintiff saw Debra Nuetzhorn, a physician's assistant (Tr. at 139-141). Past medical history included:

1) Mild depression for which she had been on Effexor but discontinued this medication and states she's doing relatively well now.

2) History of tobacco abuse, had been on Wellbutrin but was not able to quit with this medication.

Ms. Nuetzhorn's impression was back pain with radiculopathy. She provided plaintiff with prescriptions for Naproxen and Flexeril; told her to apply

8

warm moist heat to the affected area three to four times daily for 15 minutes each time; recommended no lifting, bending, or twisting for seven to ten days; and follow up as needed.

On October 24, 2001, plaintiff returned to see Dr. Kaicher for an annual check up (Tr. at 128-132). "Reports feeling well. Long history of back pains; recently LS [lumbosacral] back ache with occasional radiculopathy symptoms down right anterior thigh. . . . Still smoking." Dr. Kaicher performed a musculoskeletal exam. Spine, ribs, pelvis: normal alignment and mobility, no deformity. Both upper and lower extremities: normal range of motion and strength, no joint enlargement or tenderness. Mood and affect: no depression, anxiety, or agitation. Assessment: Chronic and recurrent low back pain with occasional radiculopathy symptoms, suspect degenerative disc disease, smoking, excessive non-steroidal anti-inflammatory use. Plaintiff was counseled regarding the need to quit smoking and the health hazards associated with tobacco use. Dr. Kaicher ordered x-rays of plaintiff's lumbar spine.

Radiologist Bruce Hedgepeth took x-rays of plaintiff's lumbar spine on October 25, 2001 (Tr. at 126). His impression was moderate thoracolumbar scoliosis, no acute bony abnormalities.

On December 14, 2001, plaintiff saw Dr. Kaicher and complained of back pain (Tr. at 116-118, 121-122). "Her mother died in May, 1999; she considered her mother her best friend. Tobacco is about one pack per day. Alcohol infrequent.

9

She is divorced.  She is thinking about getting a face lift.  She works for a leasing equipment company."  Plaintiff was 5'4" tall and weighed 134 pounds.

Dr. Kaicher's assessment included chronic and recurrent back pain, and scoliosis.  He gave plaintiff a trial of Celebrex 200, in place of Ibuprofen; and he explained to plaintiff the risks of prolonged and excessive use of Ibuprofen.  He referred plaintiff for a trial of a TENS unit, ordered an MRI of the spine, and recommended plaintiff follow up in three months.

On January 14, 2002, plaintiff saw Mark Axness, M.D., after having been referred by Dr. Kaicher (Tr. at 111-114).  "The patient states that she has had rather severe back pain that is on again/off again, all of her life. . . .  The patient works at Edward Jones, an office worker, but states that she has not been off work for any significant amount of time.  However, last Friday, her pain was extremely severe and she did not go to work."  He noted that plaintiff smokes a pack of cigarettes per day.  "Review of Symptoms: Remarkably negative except for gastroesophageal reflux disease. . . .  This is a healthy-appearing white female in no apparent distress."

He performed an exam of her back:  "No significant tenderness to deep palpation and percussion over the entire lower back.  No muscle spasms are noted.  The bilateral sciatic notch areas are nontender."  Neurological:  "Straight leg raising exam was normal.  Sensory exam of the lower extremities is normal. . . . The patient has a normal gait as well as a heel/toe gait.  Hip flexion, extension and rotation were all normal."

10

Dr. Axness reviewed the MRI done on December 14, 2001.  His impression was lumbosacral radiculitis.  He performed a lumbar epidural steroid injection at L5-S1.

February 5, 2002, was plaintiff's alleged onset date of disability.

On February 5, 2002, plaintiff saw J. Charles Mace, M.D., because of her low back pain and leg numbness (Tr. at 105-107, 144-146).  "Mental status: Oriented to person, place and time.  Recent and remote memory is normal.  Attention and concentration are normal.  Speech is spontaneous and fluent.  Fund of knowledge is normal for education level. . . .  Musculoskeletal:  Except as noted, gait and station are normal; muscle strength of the upper and lower extremities is normal; muscle tone is normal; there is no atrophy; and there are no abnormal movements."  The MRI of her lumbar spine done at Castlegate showed a large left L5-S1 disc herniation.  Dr. Mace's impression was "Large left L5-S1 disc herniation with radiculopathy that is not improved with conservative measures.  She has had a recent epidural steroid injection which improved her pain remarkably. . . .  [S]he wishes to continue with some conservative measures for a time. . . ."  This form has a handwritten note with the date of 2/5/05 which states, "No improvement in symptoms.  Desires laminectomy/discectomy."

That same day, February 5, 2002, Dr. Mace performed a left L5-S1 laminectomy and microdiscectomy (Tr. at 102-103).  "Postoperatively, she had resolution of her leg pain. . . .  Her strength and sensation were good. She was ambulating without difficulty.  She was discharged to home on the same day."

11

On March 6, 2002, plaintiff saw Dr. Mace for a follow up of her lumbar laminectomy and microdiscectomy (Tr. at 99-101). "It has now been approximately four weeks since her left L5-S1 laminectomy and microdiscectomy. She has been doing fairly well with no significant leg symptoms. Her back does hurt her particularly after ambulating for periods of time. . . . She is somewhat frustrated by the continued episodes of back pain after being up for a significant period of time. We will initiate physical therapy for strengthening and keep her off work for now. I would like to see her in approximately six weeks to see how she is progressing. I anticipate at that time we may consider a return to work."

Dr. Mace completed a form indicating that due to displacement of lumbar, plaintiff is unable to return to work until further notice. He prescribed physical therapy three times a week for four weeks.

On March 14, 2002, plaintiff had a physical therapy initial evaluation by Mark Vandersnick, MS, PT (Tr. at 93). "Patient reports since the surgery she has experienced no improvement with pain levels. Currently, patient rates this pain a 5/10. . . . Patient states on occasion when she is lying in the supine position, she is pain-free. . . . Patient lists aggravating factors as standing while washing her dishes and walking while performing ADL's [activities of daily living] such as grocery shopping and prolonged sitting. Patient states lying supine does ease her back pain. . . . Patient has been off work since the surgery and is allowed to miss up to 90 days of work without losing her job with this time frame ending on

5/04/02.  Patient states she is checking into disability currently if she is unable to return to work."  All of the subsequent physical therapy notes are illegible.

On March 26, 2002, plaintiff saw John A. Sullivan, M.D., who performed an MRI of her lumbar spine (Tr. at 90).  His impression was:

1.  Mild lumbar rotoscoliosis with superimposed degenerative changes, most marked involving the fact joints at L4-5.

2.  Status post discectomy at L5-S1 on the left.  No evidence of recurrent disc herniation.  Fairly extensive epidural fibrosis at this level with encasement of the left S1 nerve root sleeve.

On April 15, 2002, Dr. Mace completed a form indicating that due to displacement of lumbar, plaintiff may not return to work until further notice (Tr. at 85).  The following day, on April 16, 2002, plaintiff filed her application for disability benefits.

On April 19, 2002, plaintiff saw Dr. Kaicher and complained of back pain and anxiety attacks (Tr. at 81-83).  "She states she is unable to work and has applied for social security disability.  No relief from any of the COX-II inhibitors and back on Ibuprofen which she reports helps some.  Also occasionally using Ultracet and Flexeril.  Discussed her anxiety attacks; still has these occasionally and uses Ativan. . .  Wants to continue Ativan; I have seen no evidence of any abuse on her part."

13

Past History:

(1)     History mild situational depression; resolved

(2)     History of tobacco abuse, had been on Wellbutrin but was not able to quit with this medication. . . .

(8)     Generalized anxiety disorder with mild anxiety attacks; does well with occasional Ativan.

(9)     Degenerative disc disease LS [lumbosacral] spine - S/P [status post] discectomy.

Social History:  "Tobacco is about one pack per day.  Alcohol infrequent.  She is divorced.  She is thinking about getting a face lift.  She works for a leasing equipment company."

During this visit, plaintiff weighed 130 pounds.  Dr. Kaicher's assessment was (1) anxiety disorder, generalized; (2) degeneration, lumbosacral spine; and (3) status post discectomy, lumbosacral.  He approved the use of Ibuprofen 800 mg po [by mouth] tid [three times per day] prn [as needed], and wrote, "OK to use Ultracet".  Dr. Kaicher refilled plaintiff's Flexeril, discussed the use of Ativan for occasional bouts of anxiety, and advised plaintiff to follow up in six months.  "The bulk of this visit was for counseling and lasted 20 min[utes]."

On May 9, 2002, Dr. Mace wrote a letter to whom it may concern:  "Rita Brown's care is being transferred back to Dr. John Kaicher and all decisions on her returning back to work is under his discretion.  We are following her on an as

14

needed basis.  If you have any questions or concerns, please contact our office."
(Tr. at 80).

On May 20, 2002, Dr. Kaicher wrote a letter to plaintiff stating in its
entirety:  "This letter confirms our conversation in which you have been advised
that as a result of your chronic back pains and recent back surgery, you are no
longer able to continue work in your present occupation." (Tr. at 79).

On July 17, 2002, Charles Mauldin, M.D., completed a Disability
Evaluation (Tr. at 159-162).  "She had surgery on 2/5/02 and has been worse
since then.  She has been told the worsening is due to scar tissue and arthritis. . . .
Currently she feels good in the morning but has to lie down from 1-3 pm daily.
The tops of her left third and fourth toes are numb.  She used to walk three miles
but now has trouble getting through Wal-Mart Supercenter. . . .  She doesn't do
much cooking and she doesn't go dancing. . . .  She smokes about 1/2 pack of
cigarettes per day.

Dr. Mauldin performed a physical examination:  ". . .  She converses
normally with normal psychomotor rate and facial expressions and eye contact.
At times she sits in a tripod position, but despite sitting throughout the interview,
she no longer braces with her hands as I discuss some of my opinions with her.
She easily arises from her chair and gets onto the examination table.  She rolls to
her side before she sits back up.  She ambulates with a normal gait and is able to
squat and to walk on her heels and toes normally.  She uses her upper extremities
normally."

15

Musculoskeletal: "Very mild scoliosis is seen. . . . There is no tenderness. Waddell's signs[1] are negative. . . . There is normal strength on the right but giveway weakness on the left that appears normal with encouragement."

His impression was low back pain. "Discussion: I believe that she will improve to at least her pre-operative status within the next six months. I believe that her recovery would be facilitated by returning to work though she should probably be restricted to light level duty with frequent lifting of 10 lbs. and occasional lifting of 25 lbs. Sitting could be restricted to two hours per day continuously. Walking need not be restricted, though standing still may also be limited to two hours continuously. No other work restrictions are needed."

Dr. Mauldin noted that plaintiff is able to hear and understand normal conversational speech, her gait is normal without assistive device, and there is no evidence of any mental problem. Her flexion-extension (bending forward) was 90° which was normal, lateral flexion (bending side to side) was normal, straight leg raising was essentially normal.

On August 21, 2002, a Disability Determinations physician completed a Physical Residual Functional Capacity Assessment (the doctor's signature is illegible) (Tr. at 164-171). The doctor found that plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, could stand or walk for at least two

---

[1]Presence of more than 3 or 4 specific signs on physical examination suggests that back pain may be exaggerated or the result of emotional distress rather than or in addition to physical injury.

16

hours during an eight-hour day, could sit with normal breaks for about six hours during an eight-hour day, and was limited in her ability to use her left leg to operate pedals (Tr. at 165).  The doctor found that plaintiff could never climb scaffolds, crouch, or crawl, but that she could occasionally climb ramps or stairs, balance, stoop, or kneel (Tr. at 166).  Plaintiff had no manipulative limitations, such as reaching; and had no visual, communicative or environmental limitations, except she should avoid concentrated exposure to hazards such as machinery and heights (Tr. at 167-168).  None of the doctor's notes, which support the assessment, are legible.

On August 28, 2002, C. Kenneth Bowles, Ph.D., completed a Psychiatric Review Technique (Tr. at 172-174).  He found evidence of an anxiety-related disorder but found that the impairment is not severe.

On October 17, 2002, Dr. Kaicher completed a Medical Source Statement - Physical (Tr. at 176-177).  He found that plaintiff could lift or carry five pounds frequently or occasionally, stand or walk continuously for less than 15 minutes and for a total of 20 minutes during an eight-hour work day, sit continuously for one hour and for a total of two hours during an eight-hour work day, and was limited in her ability to push or pull (when asked how, Dr. Kaicher left that part blank).  He found that plaintiff could never climb, stoop, bend, kneel, crouch, but she could occasionally balance.  He did not complete the assessment with regard to her ability to crawl, reach, handle, finger, feel, or grip.  He found that she should avoid any exposure to extreme cold, and should avoid moderate exposure

to wetness or humidity. When asked if plaintiff needs to lie down or recline to alleviate pain, Dr. Kaicher checked "yes" and indicated plaintiff needed to lie down or recline for two hours at a time twice during an eight-hour work day.

On May 2, 2003, plaintiff saw Paul Olive, M.D. (Tr. at 194-195). She had been referred to Dr. Olive for a second opinion concerning her lower back. "This patient had a left L5-S1 laminotomy and discectomy performed by Dr. Mace on 02-05-02. She states she does not feel that she got any better following that operation. She states Dr. Mace will not see her again. . . . Patient smokes one-half pack of cigarettes a day and has done so for [more than 20] years. . . . The patient has moderate limitations of motion." Dr. Olive reviewed plaintiff's previous x-rays. His impression was degenerative disc disease, no sign of recurrent disc herniation, chronic thoracic back pain that may be due to muscle fatigue.

His recommendation was as follows: "I think this patient needs to be on a strengthening program for her lower back. When I questioned her in detail about the exercises she has been performing, it sounds like she has been performing mostly stretching exercises. I went over some strengthening exercises for the lower back that I think will be of benefit. I do not think that surgery is an option for her. I do not think there is a whole lot more to offer her."

On September 10, 2003, plaintiff saw Mark Ward, M.D., to establish care (Tr. at 182-183). Plaintiff needed refills on her medications. She reported taking Ibuprofen, Ultracet, Darvocet, and Flexeril. She said she was having trouble

18

tolerating Ultracet as it seemed to make her too drowsy and was giving her some short-term memory impairment. "Back is bothersome if she over does it. Does better with her exercise program and rest, but has to learn to pace herself. Increased stress after husband died suddenly in a car accident about 1 1/2 months ago, stressful with lawyers, accountants, estate, etc. Occasionally gets some help from son, age 27."

From the objective exam, Dr. Ward noted that plaintiff was somewhat anxious, her blood pressure was elevated but coming down some after a repeat check. She said that usually her blood pressure was running within normal limits. "Tobacco coated tongue." Assessment: Stress adjustment disorder, chronic back pain syndrome. Plan: Start Effexor, stop Ultracet. Darvocet as needed, Ativan as needed, Ibuprofen, Flexeril as needed, Bentil as needed.

On October 9, 2003, plaintiff returned to see Dr. Ward (Tr. at 180). She reported that her home blood pressure readings were high. She stopped taking Effexor because she thought it may be causing headaches and she was worried it was causing blood pressure elevation. "Husband had been on Toprol XL and has some left over." Objective: Anxious somewhat. Gait normal. Gross motor exam normal. Given Toprol XL 50 mg., and Clorpres, blood pressure at 11:15 was 180/100, 15 minutes later it was 160/90. Headache resolving. No problems with medication. Assessment: Severe noncontrolled hypertension. Stress adjustment disorder. Smoker abuse. Plan: stop smoking, low sodium diet, no caffeine. Toprol XL 50m g daily.

The following day, plaintiff returned to see Dr. Ward (Tr. at 181). She reported that her headache was gone with just a dull pressure in the back of the neck. She brought in her deceased husband's Toprol XL 100 mg, "can split those in half." Her affect was somewhat calmer. Dr. Ward assessed hypertension better controlled, stress adjustment disorder, and menopausal vasomotor symptoms. He directed plaintiff to use samples of Toprol XL 50 mg daily, and to try to increase soy in her diet.

Ten days later, on October 20, 2003, plaintiff returned to see Dr. Ward (Tr. at 179). "Blood pressure goes up and has headache. Still stressful, and trying to get some disability." Objective: Affect a little bit calmer. Gait normal. Gross motor exam normal. Assessment: hypertension with headaches. Plan: Recommend cranial CT scan, rule out intracranial pressure problems or difficulties. "Patient refuses at this point." Increase Toprol XL to 75 mg. per day.

The following day, on October 21, 2003, Dr. Ward completed a Medical Source Statement Physical (Tr. at 187-188). He found that plaintiff can carry less than five pounds frequently and five pounds occasionally, stand or walk continuously for 30 minutes and for a total of two hours during an eight-hour work day, sit continuously for 30 minutes and for two hours total during an eight-hour work day, and was limited in her ability to push and pull. When asked to what extent, he wrote, "depends on weight." He wrote that plaintiff had communicative limitations as she is deaf in her right ear. Plaintiff can never climb, bend, or crawl; can occasionally balance, stoop, kneel, crouch, reach, or

20

grip; and can frequently handle, finger, and feel. Plaintiff should avoid any exposure to extreme cold, extreme heat, weather, hazards, and heights. Plaintiff needs to lie down or recline for one to two hours twice during an eight-hour work day. Plaintiff's pain, high blood pressure, and headaches cause lack of concentration. When asked what was the basis for his findings, Dr. Ward checked only "credible subjective complaints of the patient." Under comments, he wrote, "Probably benefit from objective work/occupational medicine exam."

## C.    SUMMARY OF TESTIMONY

During the January 27, 2004, hearing, plaintiff testified; and George Horne, a vocational expert, testified at the request of the ALJ.

## 1.    Plaintiff's testimony.

At the time of the administrative hearing, plaintiff was 49 years of age and is currently 50 (Tr. at 200). She has a high school education and one year of college (Tr. at 200). Prior to her disability, plaintiff worked in sales and traveled (Tr. at 200). On February 5, 2002, plaintiff was working at Edward Jones as a branch office administrator (Tr. at 201). February 5, 2002, was the date of her back surgery, and she has not worked since (Tr. at 201). Plaintiff has not made any attempt to go back to work since her surgery (Tr. at 201).

Plaintiff is a widow and has a 27-year-old son (Tr. at 201). She lives by herself (Tr. at 201). She takes care of herself, tries to keep the dishes and laundry done (Tr. at 201). She does minor cooking, and eats at fast-food places a lot (Tr. at 201-202). She can sit and read, watch television, or listen to the radio "some"

Case 6:04-cv-03394-REL   Document 14   Filed 04/18/05   Page 21 of 39

(Tr. at 202).  Plaintiff has a valid driver's license and can drive, she can visit with friends or relatives, and she goes to church (Tr. at 202).

Plaintiff has trouble walking – after an hour walking through a Wal-Mart, her back hurts and she is "just totally done" (Tr. at 202-203).  She can sit for about 30 minutes to an hour before she needs to move around due to pain (Tr. at 203).  She can stand for about ten minutes at a time (Tr. at 203).  In order to get comfortable, plaintiff lies on her right side with her head forward and with a pillow under her knees (Tr. at 203).  When asked how much she could pick up and carry, plaintiff said, "I try to keep it under, you know, under ten pounds. Normally around five." (Tr. at 204).

Plaintiff takes Darvocet, Ibuprofen, and sometimes Flexeril for her pain (Tr. at 204).  It helps some (Tr. at 204).  The Flexeril causes constipation, so she tries not to take that (Tr. at 205).  She told her doctor this week that her medication messes up her mind, makes her feel drunk (Tr. at 205).  She told her doctor that she can have an entire conversation with someone and not remember it (Tr. at 205).  Plaintiff takes medicine for her high blood pressure, and the medicine has brought her blood pressure down (Tr. at 205).

When asked to explain why she could not work, plaintiff said that she cannot be in an upright position for eight hours (Tr. at 205).  She lies down for 30 minutes to an hour around noon and then lies down again in the evening (Tr. at 205-206).  If she is up for very long, her pain gets worse and she has to take medication and lie down (Tr. at 206).  Plaintiff's back problems are not from an

22

injury – she has had back problems since she was a child as a result of her scoliosis (Tr. at 206).

**2.      Vocational expert testimony.**

Vocational expert George Horne testified at the request of the Administrative Law Judge.  Mr. Horne testified that plaintiff's past relevant work includes jobs as an automobile contract clerk, a skilled position performed at the sedentary level; an insurance sales agent, a skilled position performed at the light to medium level; customer service representative, a skilled position performed at the sedentary or light level; an administrative clerk, a semi-skilled position performed at the light exertional level (Tr. at 208-209).  Plaintiff has the following transferrable skills:  clerical responsibilities (Tr. at 211).

The first hypothetical assumed a person able to perform light work; may frequently climb, balance, stoop, kneel, crouch, and crawl; with a mild limitation on attention concentration, understanding, memory, and ability to follow directions (Tr. at 209).  The vocational expert testified that such a person could perform plaintiff's past relevant work of administrative clerk (Tr. at 209).

The second hypothetical assumed a person capable of sedentary work; could do no climbing, bending, or crawling; could occasionally balance, stoop, kneel, crouch, or reach; and could frequently handle and finger.  The person would need to avoid any exposure to cold, heat, weather, hazards, or heights (Tr. at 210).  The vocational expert testified that such a person could not perform any of plaintiff's past relevant work (Tr. at 210).  The person could, however, be an

23

order clerk, with more than 1,000 jobs in Missouri and over 46,000 in the country (Tr. at 210).

The third hypothetical included the same restrictions as in hypothetical number two, except the person would need to take four unscheduled additional 15-minute breaks each day (Tr. at 210). The vocational expert testified that such a person could perform no work (Tr. at 210).

The fourth hypothetical assumed a person who could perform sedentary work; may frequently climb, balance, stoop, kneel, crouch, and crawl; with a mild limitation on attention concentration, understanding, memory, and ability to follow directions (Tr. at 210). With plaintiff's transferrable skills, this hypothetical person could be a claims clerk II, a semi-skilled sedentary position (Tr. at 211). There are over 6,000 of these jobs in Missouri (Tr. at 211).

The fifth hypothetical assumed a person who could perform sedentary work, and who could do no climbing, bending, or crawling; could occasionally balance, stoop, kneel, crouch, or reach; and could frequently handle and finger. The person would need to avoid any exposure to cold, heat, weather, hazards, or heights (Tr. at 211). The vocational expert testified that such a person could perform the job of order clerk because the reaching requirement could be performed with the non-dominant arm (Tr. at 211-212). Jobs such a person could do include receiving telephone orders, working room service in a hotel, or taking orders at a drive through window (Tr. at 212). The reach factor would not be an issue in these positions (Tr. at 212).

24

If the person could only reach occasionally with either arm, and did not have one good arm, the person could not perform those jobs (Tr. at 212).

## V.    FINDINGS OF THE ALJ

On March 4, 2004, Administrative Law Judge Richard Leopold entered his opinion finding plaintiff not disabled at step four of the sequential analysis and alternatively at step five (Tr. at 13-18).

Step one.  The ALJ found that plaintiff has not worked since her alleged onset date of February 5, 2002 (Tr. at 14).

Step two.  The ALJ found that plaintiff suffers from a severe impairment in the musculoskeletal realm (Tr. at 14).  He found that plaintiff's mental impairment is not severe, her irritable bowel syndrome is not severe, her hypertension is not severe as it is controlled, and her hearing loss does not amount to a severe impairment (Tr. at 14-15).

Step three.  The ALJ found that plaintiff's impairment does not meet or equal a listed impairment (Tr. at 14).

Step four.  The ALJ determined that plaintiff has the residual functional capacity to perform light work, compromised by mild limitations on attention, concentration, memory, understanding, and ability to follow directions, and can frequently climb, stoop, kneel, crouch, balance, and crawl (Tr. at 18).  He found that plaintiff could return to her past relevant work as an administrative clerk (Tr. at 18, 17).

25

Step five.  Alternatively, the ALJ found that plaintiff retained the residual functional capacity to perform other jobs in the economy, such as claims clerk II, with 6,000 jobs in Missouri, and order clerk, with more than 1,000 jobs in Missouri and over 46,000 jobs in the country (Tr. at 17).

## VI.    RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff argues that the ALJ erred in giving "no consideration as to how Plaintiff's decidedly 'non-severe' impairments, in combination with each other and in combination with Plaintiff's severe impairments, restrict or limit her ability to perform basic work activities . . . .  The ALJ merely dismisses the opinions of Plaintiff's treating physicians and proceeds to derive a completely arbitrary RFC of his own, which, aside from being internally inconsistent, is clearly not reflective of the record as a whole, including the medical evidence and Plaintiff's own testimony".  Plaintiff's argument applies to the opinions of Dr. Kaicher and Dr. Ward.

The ALJ determined that plaintiff had the residual functional capacity to perform light work, compromised by mild limitations on attention, concentration, memory, understanding, and ability to follow directions, and can frequently climb, stoop, kneel, crouch, balance, and crawl.  According to the Dictionary of Occupational Titles, light work involves lifting up to 20 pounds occasionally and 10 pounds frequently; significant amount of walking or standing, or sitting most of the time but with pushing or pulling of arm or foot

26

controls; or when the job requires working at a production rate pace entailing constant pushing or pulling things with a negligible weight.

Below is a comparison of the RFC assessment of the ALJ, Dr. Kaicher, and Dr. Ward:

| Ability | ALJ | Dr. Kaicher | Dr. Ward |
|---|---|---|---|
| Frequently lift | 20 pounds | 5 pounds | Less than 5 pounds |
| Occasionally lift | 10 pounds | 5 pounds | 5 pounds |
| Sit | No limitation | 1 hour at a time, 2 hours total | 30 minutes at a time, 2 hours total |
| Stand | No limitation | Less than 15 minutes at a time, 20 minutes total | 30 minutes at a time, 2 hours total |
| Walk | No limitation | Less than 15 minutes at a time, 20 minutes total | 30 minutes at a time, 2 hours total |
| Climb | Frequently | Never | Never |
| Stoop | Frequently | Never | Occasionally |
| Kneel | Frequently | Never | Occasionally |
| Crouch | Frequently | Never | Occasionally |
| Balance | Frequently | Occasionally | Occasionally |
| Crawl | Frequently | Unknown | Never |
| Bend | No limitation | Never | Never |
| Push/Pull | No limitation | Limited (no extent given) | Limited (no extent given) |

| | | | |
|---|---|---|---|
| Attention, concentration, memory, understanding, ability to follow directions | Mild limitation | No limitation | No limitation |
| Extreme cold | No limitation | Avoid all exposure | Avoid all exposure |
| Extreme heat | No limitation | No limitation | Avoid all exposure |
| Weather | No limitation | Avoid moderate exposure | Avoid all exposure |
| Hazards | No limitation | No limitation | Avoid all exposure |
| Heights | No limitation | No limitation | Avoid all exposure |
| Need to lie down | None | 2 hours twice per work day | 1-2 hours twice per work day |

The position of administrative clerk, to which the ALJ found plaintiff could return, requires lifting 20 pounds occasionally and 10 pounds frequently, and no limitation on walking, standing, or sitting. There is no requirement for climbing, balancing, stooping, kneeling, crouching, or crawling. The position does not expose the worker to extreme cold, extreme heat, wetness, humidity, vibration, machinery, or heights. Therefore, the differences in those abilities are irrelevant because even if the ALJ had agreed with these two doctors, the result of the case would be the same. The abilities and limitations really at issue here are the ability to lift frequently and occasionally, the ability to sit, stand, and walk, and the need to lie down.

28

Therefore, below is a comparison of the relevant parts of the RFC

assessment of the ALJ, Dr. Kaicher, and Dr. Ward:

| Ability | ALJ | Dr. Kaicher | Dr. Ward |
|---|---|---|---|
| Frequently lift | 20 pounds | 5 pounds | Less than 5 pounds |
| Occasionally lift | 10 pounds | 5 pounds | 5 pounds |
| Sit | No limitation | 1 hour at a time, 2 hours total | 30 minutes at a time, 2 hours total |
| Stand | No limitation | Less than 15 minutes at a time, 20 minutes total | 30 minutes at a time, 2 hours total |
| Walk | No limitation | Less than 15 minutes at a time, 20 minutes total | 30 minutes at a time, 2 hours total |
| Need to lie down | None | 2 hours twice per work day | 1-2 hours twice per work day |

### *John Kaicher, M.D.*

Following is the ALJ's analysis of Dr. Kaicher's medical source statement:

The claimant was seen by her primary physician Dr. Kaicher in April 2002, about 2 1/2 months after her alleged onset date. The claimant reported that the surgery helped the severe radicular symptoms but complained that she still had quite a bit of persistent left low back pain, helped some by Ibuprofen. This appointment primarily concerned counseling about prescriptions for anxiety and no physical examination was reported. The claimant, however, told Dr. Kaicher that she could not return to work and had applied for social security disability. In May 2002, Dr. Kaicher wrote a brief letter stating that, as a result of chronic back pain and recent back surgery, the claimant was no longer able to work in her present occupation. Neither this report nor Dr. Kaicher's medical source statement completed in October 2002 is accompanied by report of updated examination, diagnostic studies, [or] other objective data.

29

. . . Notwithstanding Dr. Kaicher's conclusory statement that the claimant should not perform her usual occupation - that he rendered after being made aware of the claimant's application for benefits, D. Mauldin, after thorough examination, indicated that work would be beneficial.

(Tr. at 15, 16).

Plaintiff began seeing Dr. Kaicher in November 1999, primarily for stress related to the death of her mother, her inability to quit smoking, and annual check ups. In late October 2001, plaintiff reported a recent back ache. Her musculoskeletal exam was normal, her upper and lower extremities were normal with normal range of motion. There was no allegation of sitting, standing, or walking difficulties; and plaintiff was gainfully employed at this time, hence she had no reason to lie down or recline for several hours each day.

In December 2001, plaintiff saw Dr. Kaicher due to her back pain. He prescribed Celebrex in place of Ibuprofen, and referred her for a TENS unit (although there is no further discussion of the TENS unit so it is unknown whether plaintiff tried it). Again, there was no mention of any difficulty with sitting, standing, or walking, and plaintiff was employed at this time.

In mid January 2002, Dr. Kaicher referred plaintiff to Dr. Axness. Plaintiff told Dr. Axness she had not been off work for any significant amount of time due to her back. Dr. Axness performed an exam and found no tenderness in her back and no muscle spasms. Straight leg raising was normal; sensory exam of the lower extremities was normal; her gait was normal; hip flexion, extension and rotation were all normal. She had an epidural steroid injection which helped.

30

On February 5, 2002 – two and a half weeks after her appointment with Dr. Axness, plaintiff had outpatient surgery on her back and was sent home that same day, ambulating without difficulty. That was her alleged onset date. A month later, Dr. Mace, her surgeon, kept her off work and prescribed physical therapy but indicated he would probably send her back to work in six weeks. The following week (March 14, 2002), when she had her initial evaluation by a physical therapist, plaintiff stated that she had been checking into disability, even though her job would be held for her until May 4, 2002 (90 days after her surgery), and even though she had not yet begun physical therapy. Plaintiff filed her application for disability on April 16, 2002. Three days later, on April 19, 2002, she saw Dr. Kaicher (after not having seen him since December 14, 2001 – four months earlier) and told him that she could not work and had applied for social security disability. He did not perform an exam, but remarked that the bulk of the visit was for counseling and lasted 20 minutes. He refilled her Flexeril and told her it was alright to use Ibuprofen and Ultracet as needed.

A month later, on May 20, 2002, Dr. Kaicher wrote a letter confirming his and plaintiff's "conversation" in which she was advised that she is no longer able to continue to work in her current occupation. This letter was written five months after the last exam by Dr. Kaicher, and it misstates the previous appointment (i.e., the medical notes state that plaintiff told Dr. Kaicher she could no longer work, Dr. Kaicher did not inform plaintiff that she could not work).

On October 17, 2002 – ten months after his last exam of plaintiff – Dr. Kaicher completed the extremely limiting medical source statement. There is no indication that Dr. Kaicher treated plaintiff at any time after the April 19, 2002, "counseling" session.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). Clearly Dr. Kaicher's letter indicating that plaintiff cannot work in her current occupation[2] and his medical source statement are not well supported by medically acceptable clinical and laboratory diagnostic techniques. Nowhere in any of Dr. Kaicher's records does plaintiff allege an inability to sit, stand, or walk, or a need to lie down or recline during the day. He never examined her after her February 2, 2002, surgery. His medical source statement was completed almost a year after his final exam of plaintiff, after her back surgery, and after he had apparently stopped treating her.

In addition to the opinion not being supported by Dr. Kaicher's own medical notes, the opinion is contradicted by other credible evidence in the record. On March 6, 2002, Dr. Mace, plaintiff's back surgeon, indicated that she

---

[2]A physician's opinion that a claimant cannot work is not a medical opinion, but is an opinion on the application of the Social Security Act, which is the sole responsibility of the ALJ. Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991).

32

would likely be able to return to work in six weeks. Five weeks later, he completed a form indicating she was off work until further notice, but he then transferred her care back to Dr. Kaicher and stated that "all decisions on her returning back to work [are] under his discretion." This was after plaintiff filed her disability application.

On July 17, 2002, Dr. Mauldin performed a thorough exam and found that plaintiff's recovery would take about six months and would be facilitated by returning to work at the light level. He found that she could lift 10 pounds frequently and 25 pounds occasionally, she could sit for two hours at a time, she could stand for two hours at a time, and she could walk without restriction. In support of his findings, he noted, among other things, that plaintiff's flexion-extension was normal, her lateral flexion was normal, and straight leg raising was essentially normal. She had very mild scoliosis, no tenderness in her back, normal strength on the right, and normal on the back if she really tried. He observed that she ambulated with a normal gait, was able to squat and walk on her heels and toes normally, she used her upper extremities normally, she was able to "easily" get up from her chair and get on the examination table. Although she sat in a tripod position, even after sitting through the interview she stopped bracing herself with her hands as she and Dr. Mauldin discussed his opinions.

On August 21, 2002, a Disability Determinations physician whose name is illegible found that plaintiff could occasionally lift 20 pounds and frequently lift ten pounds, could stand or walk for two hours, could sit for six hours, and had no

limitations on reaching. Although the doctor's notes are illegible, I note that these findings – made one month after Dr. Mauldin's findings – are nearly identical to Dr. Mauldin's findings.

Finally, I note that plaintiff filed her application for benefits on April 16, 2002; yet she did not seek treatment for her back again until 13 months later, on May 2, 2003, when she saw Dr. Olive. At that time, Dr. Olive indicated that plaintiff should be doing strengthening exercises rather that just stretching exercises, and that he believed her pain was due to muscle fatigue. Plaintiff then waited another four months and went to a new doctor, Dr. Ward.

Based on all of the above, I find that the ALJ properly discounted the opinion of Dr. Kaicher as it was not supported by his own medical notes and contradicts the other evidence in the record.

### *Mark Ward, M.D.*

Following is the ALJ's analysis of Dr. Ward's opinion:

The file also includes a medical source statement completed by Dr. Ward in October 2003 that restricts the claimant to less than a full range of sedentary work. Dr. Ward had treated the claimant for only one month as of that date. His office records reflect an essentially normal examination, with a showing of decreased sensation at S1 nerve root dermatome and elevated blood pressure initially, controlled by October 2003. The latest assessment of active problems relates stress adjustment disorder and menopausal vasomotor symptoms. It is apparent that Dr. Ward has no direct longitudinal connect with the claimant and that he does not provide an objective analysis. Indeed, Dr. Ward wrote on the medical source form that the claimant would probably benefit from objective work/ occupational medicine exam.

(Tr. at 15-16).

Dr. Ward first saw plaintiff on September 10, 2003, to establish care and refill her medications. There was very little said about her back during this visit, it mostly focused on her high blood pressure and the stress of having lost her husband in an automobile accident a month and a half earlier. He substituted Effexor for Ultracet, told her to take Darvocet, Ibuprofen, and Flexeril as needed. There were no allegations of an inability to sit, stand, or walk, other than her saying her back is "bothersome if she over does it." There is no recommendation by Dr. Ward that plaintiff limit her sitting, standing, or walking, or that she lie down or recline for pain relief.

Plaintiff saw Dr. Ward a month later, on October 9, 2003. Her gross motor exam was normal, her gait was normal, she was having no problems with medication, and her appointment centered around her blood pressure. The following day, on October 10, 2003, Dr. Ward assessed "hypertension, better controlled", stress adjustment disorder, and menopausal symptoms. There was no discussion about an inability to sit, stand, or walk, and there was no discussion about a need to lie down or recline.

On October 20, 2003, plaintiff saw Dr. Ward again, "still stressful, and trying to get some disability." Her gait was normal, her gross motor was exam was normal. Again, the appointment discussed plaintiff's blood pressure, and there was no mention of difficulty sitting, standing, or walking, and no recommendations were made regarding lying down or reclining.

After just those few appointments, focused almost exclusively on plaintiff's blood pressure, Dr. Ward completed his very limiting medical source statement which was based entirely (according to him) on plaintiff's subjective complaints. The form on its face gives the ALJ reason to discredit it, as Dr. Ward makes it abundantly clear that the assessment is not based on any medical findings but is based solely on plaintiff's statements about what she could do.[3] The ALJ properly discounted this opinion as well.

### ALJ's Residual Functional Capacity

There is almost no mention of difficulty sitting, standing, or walking, and there is no allegation by plaintiff to any of her doctors that reclining or lying down during the day helps. There is no recommendation by any of her doctors that she limit her sitting, standing, or walking beyond the extent found by the ALJ in his RFC assessment, and there is no recommendation by any doctor that plaintiff recline or lie down during the day for pain relief.

A comparison of the ALJ's findings with those of the other doctors who provided medical source statements follows:

| Ability | ALJ | Dr. Mauldin | DDS physician |
|---|---|---|---|
| Occasionally lift | 20 pounds | 25 pounds | 20 pounds |
| Frequently lift | 10 pounds | 10 pounds | 10 pounds |

---

[3]Since Dr. Kaicher almost mirrors Dr. Ward's assessment, and it is clear that Dr. Kaicher's assessment is not based on his medical records, it appears that Dr. Kaicher's medical source statement figures were also obtained from plaintiff.

| Sit | No limitation | 2 hours | 6 hours |
| Stand | No limitation | 2 hours | 2 hours |
| Walk | No limitation | No limitation | 2 hours |
| Need to lie down or recline | None | None | None |

In addition to the input from Dr. Mauldin and the DDS physician, the ALJ knew that on February 5, 2002, Dr. Mace observed that plaintiff was ambulating without difficulty. On March 6, 2002, plaintiff told Dr. Mace she had back pain "after being up for a significant amount of time." There is no explanation as to how long was a significant amount of time, or whether being up meant sitting, standing, walking, or a combination of all three. On April 16, 2002, Linda Jarman of Disability Determinations observed that plaintiff had no difficulty sitting, standing, or walking. After her April 16, 2002, application for disability benefits, plaintiff never told any doctor that she had problems with sitting, standing, or walking, except she told Dr. Mauldin that she used to walk three miles but now has trouble getting through a Wal-Mart Supercenter. Dr. Mauldin, with that information along with the information gleaned from his examination of plaintiff, found that she had no limitation on walking. It is the ALJ's duty to formulate a claimant's RFC based upon all of the credible evidence of record. 20 C.F.R. §§ 404.1520(a), (e), and (f), 404.1545-46, 404.1561; Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Case 6:04-cv-03394-REL   Document 14   Filed 04/18/05   Page 37 of 39

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's residual functional capacity assessment.

## VII.   DEMANDS OF PLAINTIFF'S PAST RELEVANT WORK

Plaintiff next argues that the ALJ failed to make explicit findings as to the physical and mental demands of plaintiff's past relevant work before finding that she could return to that work.  The ALJ must make explicit findings regarding the actual physical and mental demands of a claimant's past work and compare the actual demands of the past work with the claimant's RFC.  20 C.F.R. §§ 404.1520(e) and 404.1560(b).  The ALJ relied on the testimony of the vocational expert, who utilized plaintiff's written vocational history reports and testimony regarding her past relevant work in determining that her past job as an administrative clerk was semi-skilled and performed at the light exertional level.  If an individual can perform her past relevant work, either as she performed it, or as the work is performed in the national economy, she is not disabled.  Jones v. Chater, 86 F.3d 823, 825 (8th Cir. 1996).

In any event, the ALJ alternatively found that plaintiff could perform the job of claims clerk, which is a sedentary position.  Because I find that the ALJ's RFC assessment is supported by substantial evidence, and plaintiff's RFC (with the ability to perform light work) is sufficient to perform the sedentary position of claims clerk, this argument is essentially moot.

Case 6:04-cv-03394-REL   Document 14   Filed 04/18/05   Page 38 of 39

## VIII. CONCLUSIONS

Based on all of the above, I find that the ALJ properly discredited the opinions of Dr. Kaicher and Dr. Ward, his RFC determination is based on the substantial evidence in the record, and he properly found at step four of the sequential analysis that plaintiff could return to her past relevant work as an administrative clerk. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


　/s/ Robert E. Larsen　
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 18, 2005

39